THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v DAVID PUTLAND, Appellant.

Second Department, December 31, 1984

### APPEARANCES OF COUNSEL

*Noel Tepper* for appellant.

*William V. Grady, District Attorney* (*Bridget R. Steller* and *Joan H. McCarthy* of counsel), for respondent.

### OPINION OF THE COURT

*Per Curiam.*

Defendant David Putland was charged, as a juvenile offender (see Penal Law, § 10.00, subd 18), with murder in the second degree (Penal Law, § 125.25, subd 1) and sodomy in the first

degree (Penal Law, § 130.50). The underlying events occurred on the afternoon of September 25, 1979 and resulted in the asphyxiation by ligature of seven-year-old Christopher Listemann, defendant's neighbor. At the time, defendant, a well-developed six-foot-tall youth weighing 180 to 190 pounds, was less than one month short of his sixteenth birthday.

Following his arraignment, defendant moved, among other things, to suppress certain statements made by him to law enforcement officials. Upon completion of a lengthy *Huntley* hearing (see *People v Huntley,* 15 NY2d 72), Judge Rosenblatt, in a most comprehensive and articulate memorandum delineating, *inter alia,* extensive findings of fact, denied that branch of defendant's motion which was to suppress the statements. Defendant was subsequently convicted, upon a jury verdict, of murder in the second degree and sodomy in the first degree. We affirm.

According to the evidence adduced at the suppression hearing, Christopher Listemann's mother reported her son as missing to the State Police at about 5:00 P.M. on the afternoon of September 25, 1979. The child had been expected home aboard a school bus shortly after 3:00 P.M. that day. The desk officer at the Rhinebeck State Police Barracks then dispatched Trooper Harold D. Bloomer to the Listemann residence on Slate Quarry Road. Trooper J. V. Fulmer, Jr., then on mobile patrol, was similarly dispatched and after a trip of some 10 to 15 minutes duration he arrived at the Listemann home to aid in the search for the boy about five minutes after Trooper Bloomer, who briefed Fulmer on the situation. Trooper Bloomer and Mrs. Listemann had already conducted an initial search of the area immediately surrounding the residence prior to Fulmer's arrival. The two troopers and Mrs. Listemann then searched the home, again with negative results.

Neighbors had been alerted concerning the missing boy and aided in the search. They included Frederick Dorrer and his son, who were alerted by the police. Defendant also assisted in the search. He was first noticed by Trooper Fulmer in the Listemann kitchen where some of the searchers had gathered. Defendant offered to check a vacant house nearby and shortly thereafter left. It was approximately 5:45 P.M. Dorrer also noted defendant's presence and help, while Senior Investigator John Crodelle recalled defendant directing him to the Listemann residence and indicating that he was "looking for the boy".

The Putland family, including defendant, commenced eating supper at about 6:00 P.M. Afterwards, defendant and his father set out for the Listemann residence to assist in the search.

Defendant remained outside. According to Frederick Dorrer, he saw defendant coming from the direction of the Putland home toward the Listemann house. He walked into the garage calling Dorrer to join him. Defendant told Dorrer that he could not go upstairs and tell the people there: he had found Christopher, who was dead. Dorrer called over dog-handler Troopers Krug and O'Hearn. Defendant then led a group, including Troopers Krug and Bloomer, who caught up with them, into the adjoining woods. Trooper Fulmer testified that a little before 7:00 P.M., he met a civilian, William Hammond, who told him that the missing boy's body had been found. Fulmer observed defendant followed by Troopers Krug and O'Hearn entering the woods some 50 yards away and followed.

The members of the group, their way illuminated by flashlights, proceeded into the woods, walked about 250 yards through thick underbrush and stopped at a clearing, whereupon defendant indicated that the body was "around here somewhere". A search line was formed, and in a matter of minutes Trooper Krug found the body.

Defendant, who was still standing in the clearing, did not go near the body. Trooper Fulmer asked defendant whether he could tell him anything with respect to what had occurred and defendant explained that he had found the body, indicating its location. Fulmer then asked if there was anything else defendant could tell them which might help and defendant responded by asking: "Are you trying to accuse me of this?" Fulmer reassured defendant that he was not, but was merely trying to find out what had happened. Indeed, as the County Court observed, at this time the existence of foul play could neither be ruled in nor ruled out. The body had been discovered fully clothed and as Investigator Thomas Salmon testified at the hearing, it presented no outstanding features other than marks on the right side of the neck. As Senior Investigator John Crodelle explained, the death was considered "suspicious", as was any unattended death, but not a homicide. After Fulmer's assurance, defendant began to cry, fell to his knees, requested his father and said he would "tell [his] father what happened". Fulmer further reassured defendant, explaining: "We are not accusing you; you are not under arrest". He did not engage in any additional conversation with defendant and told Investigator Salmon of the request.

Sometime after 8:00 P.M., Senior Investigator Crodelle spoke to defendant in the woods. Crodelle inquired how defendant happened to find the body and what the circumstances surrounding such event were. Defendant responded "[d]on't accuse

me of anything" and requested to speak with his father. Crodelle assured him that at that time there was nothing to accuse him of, the interest was just in the circumstances of defendant's discovery. Defendant said he would inform his father of the circumstances, explaining that his father was at home. Defendant also told Investigator Salmon that he wanted to see his father.

Between 8:30 and 9:00 P.M., Senior Investigator Crodelle and Investigator Salmon, Trooper Bloomer and defendant arrived at the Putland residence in Crodelle's car. George Putland, defendant's father, was outside and defendant exited the car first, embraced his father and engaged in a brief private conversation with him some 25 to 30 feet away from, and out of hearing of, the police. After the father and son had concluded, Senior Investigator Crodelle approached and explained to Mr. Putland that his son had found the missing boy and the police would like to ask him some questions concerning his discovery. Mr. Putland said he had no objection but explained he did not have a babysitter. However, he mentioned a neighbor who might take on the task and entered his home accompanied by defendant.[*]

Shortly thereafter, Senior Investigator Crodelle entered the house and explained to Mr. Putland that he would like to take a statement from defendant at the Rhinebeck Barracks. Mr. Putland had no objection and Crodelle drove to the Listemann home to see if the neighbor suggested by George Putland would mind the defendant's infant sister. The neighbor declined, believing she was needed more where she was, and Crodelle returned to the Putland house. Mr. Putland suggested that they wait for his wife, who was expected shortly. It was then about 8:35 or 8:40 P.M. and Senior Investigator Crodelle, Investigator Salmon, Mr. Putland and the defendant waited in the front room and watched television. It is clear from the record that defendant's movements were not in any way restricted and there were no discussions other than as to the babysitter problem and the weather. By the time Mrs. Putland returned, it was just past 10:00 P.M. While in total there had been a wait of about an hour and a half, the delay was unexpected. Further, as the County Court found, during the wait for Mrs. Putland, the police were in and out of the home and defendant and his father were not deprived of an opportunity for privacy. At one time, while outside the home, Investigator Salmon did point out to Senior

---

[*] Defendant lived with his father, stepmother Jacqueline, and infant sister, then about six months old. On the evening in question Jacqueline Putland had left at about 7:15 P.M. to drive her parents, who had shared supper with the family, to Kingston where she was to meet a girlfriend.

Investigator Crodelle that he had seen a rope in the Putland living room; however, Salmon did not consider defendant a suspect at the time. Mr. Putland and defendant were then driven to the Rhinebeck Barracks, some eight miles distant, accompanied by Investigators Salmon and Ingellis. Trooper Bloomer, who had also waited, remained with Mrs. Putland to reassure her, as she had a young baby and there had been an unexplained death in the vicinity.

The group arrived at the barracks at about 10:30 P.M. at which time they went to Investigator Salmon's office where the latter conducted an interview until about midnight. The purpose was to elicit facts surrounding the finding of the body, including information regarding the people and vehicles that defendant had observed that afternoon. They discussed the incident orally and then Investigator Salmon reduced the conversation to a written narrative form. Mr. Putland often repeated questions asked by Investigator Salmon to help his son understand, and also volunteered that he had instructed his son to take two flashlights into the woods. At about 10:50 P.M. Mr. Putland expressed concern as to the specificity of Salmon's questions. Investigator Salmon explained that since defendant had just furnished information about a car with a person in it named Krumenacker, Salmon wanted to pinpoint the exact time and place of the observation. The father then allowed the interview to continue. Also, at about this time, defendant expressed a desire to speak with Investigator "Manny" Sanchez, who had known both defendant and his father for some 2½ years, and Investigator Ingellis left to locate Sanchez. Toward the end of the interview, at about a few minutes before midnight, Mr. Putland again expressed concern as to the details Investigator Salmon was seeking concerning the proximity of the body to a large pine tree. Salmon, who was unfamiliar with the area, explained his need for such details and was permitted to continue. It was about midnight when Investigator Sanchez arrived and the Salmon interview concluded. Sanchez greeted father and son, shook hands with the father, who smiled, looked at defendant and said "I understand that you wanted to talk with me". Defendant responded in the affirmative, after which Sanchez inquired of Mr. Putland whether it would be permissible for him to interview defendant alone and the father readily consented. As the County Court found, at this time Investigator Sanchez had no objective foundation upon which to suspect defendant of any crime and did not indicate any such suspicion to either defendant or his father.

It was between 12:30 and 12:45 A.M. when Investigator Sanchez, who was unarmed, and defendant, repaired to an office where Sanchez had previously interviewed juveniles. Mr. Putland waited in the barracks television room. He testified that his son had previously expressed a desire to see and speak to "Manny * * * my friend" when father and son had initially met outside their home and spoken together. Sanchez closed the office door, the pair sat about two feet apart and they began to talk. During this first phase of their conversation Sanchez initially inquired as to why defendant wanted to speak to him, how Sanchez could help him and what had happened. While defendant seemed to Sanchez to be very relaxed and not upset or hostile, some 10 to 15 minutes elapsed before he began to communicate. Defendant explained that he wanted to speak with Sanchez because he could not talk to his father, of whom he was afraid, and he did not like speaking to the other officers. The two then spoke of a number of things including their mutual church affiliation, their work together at the church booth at the county fair and Sanchez' children, with whom defendant had played at the fair. This portion of the conversation lasted until about 1:30 A.M., at which time Sanchez told defendant that should he wish to leave the room and go home at any point during their talk, he was free to do so. Further, if he wanted to speak to his father, Sanchez would be more than glad to have him come in. Defendant specifically indicated that he understood and that he did not want his father there.

The next phase of defendant's conversation with Sanchez lasted about 90 to 105 minutes. While the responses were slow in coming, defendant told Sanchez that he and Christopher had been playing cops and robbers in the woods by "his tree", a large pine. Defendant had brought a rope from his home and thrown it over one of the branches securing one end to another branch. He put a loop in the rope, slid it around his thighs and swung back and forth. Christopher wanted to try, so he began climbing the tree. He stood on the first branch and put the noose over his head. He attempted to get the rope over his arms, but had difficulty because of his size. Christopher slipped and the noose tightened around his neck. Defendant realized that the boy was hanging, climbed down, grabbed Christopher's body, raised him in the air and loosened the knot which was tied to the branch. This was the first time that Sanchez learned of defendant's presence at the time of Christopher's demise. In response to Sanchez' request for clarification, defendant furnished a second account of the events. However, this time he said the rope was in his hands and that he pulled it — he thought too soon — and

Christopher slipped. Investigator Sanchez now believed that the death was not accidental. Accordingly, he told defendant that he was going to advise him of his *Miranda* rights because he believed that defendant had helped cause the death. Upon inquiry, defendant responded that he was familiar with the *Miranda* rights, having heard them on television. Investigator Sanchez read the rights from a card and after each of the four warnings, defendant stated that he understood. He also told Sanchez that he did not want an attorney and would continue to speak to Sanchez. It was approximately 3:30 or 3:45 A.M.

At about 4:00 A.M., Sanchez called Investigator Ingellis to stay with defendant, who drank a soda but declined a doughnut. Sanchez informed Mr. Putland that his son had been advised of his *Miranda* rights. While Sanchez did not specifically state that defendant was under arrest or in custody, he did tell Mr. Putland that defendant admitted that he had been playing in the woods with Christopher and while the rope was around Christopher's neck had pulled it, hanging Christopher. Mr. Putland indicated relief at the disclosure. Defendant's father, a college graduate, admitted at the hearing that he had previously heard of the *Miranda* rights and knew they were read to persons when they were arrested. When Sanchez and Mr. Putland entered the interview room, defendant did not look up and did not respond to the urging of Sanchez that he speak with his father. Sanchez left the room to get a waiver form, the father embraced his son, the two remained together for about five minutes and then, according to Ingellis, the father shrugged and left the room. When Sanchez returned, he inquired about Mr. Putland and was told that he had just left. Sanchez then pulled his chair next to defendant, read the *Miranda* waiver form and asked that defendant initial each warning. At 4:15 A.M., after they had reviewed the document, defendant, and Investigators Sanchez and Ingellis signed it. Defendant did not testify at the *Huntley* hearing.

The County Court concluded that custody began when Investigator Sanchez left the interview room in order to summon defendant's father, and that, at that point, the police were possessed of probable cause to effect an arrest. On this appeal, defendant would persuade this court that, "as a matter of law [he] was in police custody much earlier", specifically from the time he "led the police to the [body] he was under the authority and control of the police". We cannot agree.

Defendant contends, *inter alia,* that the two statements made by him to Investigator Sanchez constitute the fruits of a custodial interrogation. Under the rule of *Miranda v Arizona* (384 US 436) "custody" triggers "compulsion", which in turn triggers the

privilege against self incrimination and the necessity that four warnings be given before waiver of the privilege can be found. One not in custody need not be given the four warnings (1 CJI [NY] 11.00, p 613, Comment; see, also, Sobel, The "Second-Bite" Role of the Jury in the Admissibility of Confessions in New York, 48 Brooklyn L Rev 1, 7). The Court of Appeals has written that in determining whether a particular individual was in custody prior to receiving the *Miranda* warnings: "the subjective beliefs of the defendant are not to be the determinative factor. The test is not what the defendant thought, but rather what a reasonable man, innocent of any crime, would have thought had he been in the defendant's position" (*People v Yukl,* 25 NY2d 585, 589, cert den 400 US 851; see, also, *People v Rodney P.,* 21 NY2d 1, 9).

Additionally, we must bear in mind that the issue of whether a defendant was in custody at a particular time is generally an issue of fact (see *People v Albro,* 52 NY2d 619, 623). Where Criminal Term finds that the People have sustained their burden of establishing voluntariness beyond a reasonable doubt (see *People v Huntley,* 15 NY2d 72, 78, *supra*), much weight must be accorded the suppression court's determination (*People v Leonard,* 59 AD2d 1, 13; see *People v Prochilo,* 41 NY2d 759, 761). "The memory, motive, mental capacity, accuracy of observation and statement, truthfulness and other tests of the reliability of witnesses can be passed upon with greater safety by [a criminal court Judge] who sees and hears the witnesses than by appellate judges who simply read the printed record" (*Barnet v Cannizzaro,* 3 AD2d 745, 747; see *People v Garafolo,* 44 AD2d 86, 88; *People v Gaimari,* 176 NY 84, 94; see, also, *People v Yukl,* 25 NY2d 585, 588, *supra*).

In the case at bar, it cannot be said that an innocent 15 year old in defendant's position would have reasonably considered himself in custody prior to the time the *Miranda* warnings were furnished. The mere fact that a person is interviewed at a police station, albeit at the request of the police, is but one factor to be considered (*People v Yukl, supra,* p 589; see *People v Pugliese,* 26 NY2d 478, 480; see, also, *Oregon v Mathiason,* 429 US 492). Further, police suspicion of which a defendant is unaware does not serve to render an otherwise neutral environment coercive (*People v Pugliese, supra,* p 480; *People v Korsing,* 71 AD2d 628). At bar, defendant projected himself in the role of a helpful neighbor and volunteer. The fact that he was in the vicinity of the crime on the afternoon in question, very actively participated in the search for Christopher and then found the body, put him in an excellent and unique position to offer the police

relevant and necessary information pertaining to the circumstances surrounding the boy's death (see *People v Korsing, supra*), for example, information regarding those persons and vehicles observed in the neighborhood, the nature of the terrain and how defendant discovered the body. Indeed, a reasonable individual of defendant's age, innocent of any crime, and in defendant's position, could not possibly have believed himself in custody. Rather, he would have thought himself an important witness possessed of information relevant and necessary to the investigation of the matter and that the purpose of defendant's presence at the police barracks was to reduce to a writing his prior observations (see *People v Patterson,* 73 AD2d 922, 924, affd 53 NY2d 829). In sum, the court's findings were amply supported by the record and not improper as a matter of law (see *People v Leonti,* 18 NY2d 384, 391).

█ We have carefully considered defendant's assertions of impropriety in the prosecutor's statements in summation and find that those claims of error of law were not preserved for appellate review (see CPL 470.05, subd 2; *People v Sherman,* 106 AD2d 416). Furthermore there is no basis in the record sufficient to warrant invocation of our interest of justice jurisdiction.

We have examined defendant's remaining contentions and for the reasons stated in the excellent memorandum decision of Judge Rosenblatt at the County Court, we find that they are without merit.

Accordingly, the judgment appealed from should be affirmed.

NIEHOFF, J. P., RUBIN, BOYERS and EIBER, JJ., concur.

Judgment of the County Court, Dutchess County, rendered July 22, 1980, affirmed.