■ In the Matter of JULIAN B., Respondent.—Appeal from an amended order of the Family Court, Queens County (Pearce, J.), dated July 16, 1984, which granted that branch of the respondent's motion which was to suppress evidence of certain statements and verbal acts. (We treat a notice of appeal from an order dated June 21, 1986, as a premature notice of appeal from the amended order dated July 16, 1984; see, CPLR 5520 [c].)

Ordered that the amended order dated July 16, 1984, is affirmed, without costs or disbursements. No opinion. Lazer, J. P., and Bracken, J., concur.

Kooper, J., concurs, with the following opinion in which Spatt, J., concurs. The principal question to be determined on this appeal is whether the respondent Julian B., who was seven years old at the time of the events herein described, validly waived his *Miranda* rights before confessing to the murder of the two-year-old victim, Reggie Clegg. Following a combined competency and *Huntley* hearing (see, People v Huntley, 15 NY2d 72), the Family Court found, inter alia, that the respondent had not made a knowing and intelligent waiver, and the statements were suppressed. We are compelled to agree, on the record before us, that the presentment agency in this case failed to carry the burden necessary to establish that the statements of the infant respondent were voluntary beyond a reasonable doubt (see, People v Valerius, 31 NY2d 51, 55). We therefore vote to affirm.

In the early evening hours of July 31, 1983, the body of the two-year-old victim Reggie Clegg was found in a grassy area a few feet from one of the apartment buildings of the Woodside Housing Project in Queens. It appeared that the child had fallen or been pushed from the roof of the building, and an investigation was commenced by both the New York City Police Department and the New York City Housing Authority Police Department.

The testimony at the hearing makes it clear that the investigation focused on the respondent almost immediately. However, the officers disagreed as to the status of the respondent at the outset of the inquiry. Sergeant Harrigan testified that the respondent was sought out solely because it was believed that he had been a witness to the tragic occurrence.

According to Detective Laxton of the New York City Police Department, the initial information gathered at the scene caused the police to suspect that the respondent had thrown the victim from the roof. In any event, it is uncontradicted that after canvassing the area, Sergeant Harrigan went directly from the scene to the apartment of the respondent's family in another building of the same housing complex. He was met at the door of the apartment by the respondent's mother, who, without any preliminary questioning, instantly said, "I know why you are here—I have witnesses to say that my sons were no where [sic] near that building". Harrigan asked Mrs. B. if she, the respondent and the respondent's brother, known as Pat-Pat, would accompany him back to the scene, and she agreed. They arrived there at approximately 10:10 P.M., but because of the crowd, the officers decided to take the respondent, his mother and his brother to the station house.

The officers who testified for the presentment agency at the suppression hearing all gave contradictory versions of the events that transpired once the respondent reached the station house at approximately 10:30 or 10:45 P.M. However, a few salient points emerge.

First, the infant respondent and his family were not taken to that part of the precinct set aside for the questioning of juveniles. Instead, they were brought to the lunchroom. Then, sometime after 11:00 P.M. the seven-year-old respondent was separated from his mother, when she accompanied Pat-Pat to another room for questioning. Alone in the lunchroom and outside of the presence of his mother, the respondent Julian B. was questioned about the incident by several officers. When Mrs. B. inquired about the respondent, she was told only that Julian was giving the police inconsistent stories.

During this questioning while separated from his family, the respondent made a statement that was essentially exculpatory but which placed him at the scene at the time of the victim's fatal fall; specifically, the respondent told the officers that he tried to grab young Clegg, but that the child's sneaker came off in his hand.[1] The respondent and his mother were then advised of the *Miranda* rights by Sergeant Sepe of the New York City Housing Police Department and Detective Laxton. Both of these officers were aware that Julian was

---

1. Another officer testified that the respondent had made this statement while he was with the police at the scene of the crime, before he was brought to the precinct.

seven years old. In addition, Laxton knew that the respondent was considered "slow" and was in a special class at school. Nevertheless, neither officer attempted to simplify or explain the *Miranda* rights to Julian, and at the hearing Laxton conceded that he did not expect Julian to understand them.

After being read the warnings, Mrs. B. asked to speak to her son alone, and was permitted to do so. She then indicated that Julian would tell them what happened. Julian, who may have been readvised of his rights at that point, confessed to throwing the Clegg boy off the roof of the building when he became angry at him over a toy car. Shortly thereafter he led the police to the spot on the roof from which the young victim met his death.

In addition to the above testimony, adduced during the *Huntley* part of the hearing, Dr. Norman Kaplan, the court-appointed psychiatrist, testified on the issue of Julian's competence to stand trial. Dr. Kaplan had interviewed Julian at the direction of the hearing court and found him, although of below-average intelligence, to be competent to stand trial. However, all attempts by defense counsel to question Dr. Kaplan concerning Julian's ability to understand and waive his *Miranda* rights were blocked by the objections of the attorney for the presentment agency. These objections were sustained by the hearing court. The *Huntley* hearing immediately followed Dr. Kaplan's testimony. However, the attorney for the presentment agency offered no evidence or testimony on this vital issue.

At the close of the hearing the respondent's motion to suppress was granted on the ground that Julian had not knowingly waived his *Miranda* rights. The presentment agency has appealed that ruling pursuant to Family Court Act § 365.1 (2) (c), having certified that the suppression order destroyed any reasonable possibility of proving the allegations contained in its petition *(see,* Family Ct Act § 330.2 [9]). It is the position of the agency that the *Miranda* warnings were not required in the first instance because Julian B. was not in custody at the time the statements were made. In any event, the agency contends that the respondent did make a knowing and voluntary waiver of those rights. Neither argument can withstand scrutiny.

The issue of whether a suspect is in custody at a particular time is an issue of fact *(People v Williamson,* 51 NY2d 801;

*People v Yukl*, 25 NY2d 585, *cert denied* 400 US 851; *People v Putland*, 105 AD2d 199, 206) and as such, the findings of the hearing court are entitled to great weight *(see, People v Prochilo*, 41 NY2d 759, 761; *People v Quartararo*, 113 AD2d 845, 848). Here, the respondent, a very young child, was taken from his home late at night and brought first to the crime scene and then to the police station. There, both he and his brother were questioned over a period of time; he was then separated from his family members and further questioned by the police. Finally, well after 11:00 P.M. and after admitting that he had been at the scene, Julian B. was given the *Miranda* warnings and questioned again. These facts fully support the hearing court's determination that Julian B. was in custody at the police precinct, and we see no reason to disturb that finding.

Once it is determined that a suspect is in custody, it necessarily follows that he cannot be questioned by the police until he is informed of his rights pursuant to *Miranda v Arizona* (384 US 436). Where the suspect is a juvenile, it is also required, in this State, that the warnings be given to the parent of the child as well, and that the questioning itself take place only in certain designated facilities (Family Ct Act § 305.2 [4], [7]). These additional safeguards have been imposed because it is recognized that "special care must be taken to insure the rights of minors who are exposed to the criminal justice system" *(People v Ward*, 95 AD2d 351, 354; *see also, Matter of Gault*, 387 US 1; *Haley v Ohio*, 332 US 596). Here, the police failed to comply with these requirements. They questioned Julian outside the presence of his mother *(see, Matter of Aaron D.*, 30 AD2d 183) and without, at first, informing either Julian or Mrs. B. of the *Miranda* rights. It is clear, therefore, that the original and partly exculpatory statement made by the respondent must be suppressed as it was the product of this improper custodial questioning.

We now turn to the principal issue of this case, the admissibility of the statements and verbal acts which were made after he and his mother were administered the *Miranda* warnings. At oral argument before this court, the attorney for the presentment agency conceded that the agency did not rely upon the waiver of Julian's rights which may have been made by his mother, but that it was necessary for the child himself to have also waived his rights. We find, under the totality of the circumstances here, that the respondent Julian B. was not

adequately apprised of his rights, and therefore, he did not knowingly and intelligently waive them.[2]

The *Miranda* warnings, and the protection intended to be afforded by them, are meaningless unless they are understood. For example, it will not suffice to advise a suspect of his rights in a language that he does not understand, and a waiver under such circumstances would, of course, be no waiver at all *(see, e.g., People v Williams,* 62 NY2d 285, 289). However, it is also recognized that it is neither the duty nor the function of the police to provide a suspect with a general legal education. The burden of establishing waiver will be met when it is shown that the suspect grasped the essential elements of the *Miranda* warnings, and understood how they affected the custodial interrogation *(People v Williams,* 62 NY2d 285, 289, *supra).* No such showing has been made here.

The police were aware that the respondent was seven years old. They were also aware of the lateness of the hour. There was testimony indicating that the child was tired. Most importantly, at least one of the officers who advised Julian B. of his rights was aware that the respondent was "slow", intellectually speaking, and attended a special class at his school. Given this information, the officers should have been aware that Julian might have difficulty comprehending the *Miranda* rights as they would normally be given. Nevertheless, instead of attempting to explain these rights to Julian in simplified language that the youngster might more readily understand, the officers merely gave him the ordinary, ritualistic reading of the *Miranda* warnings from a printed card *(cf. People v Williams,* 62 NY2d 285, *supra).* They also failed to question Julian to ascertain if he actually understood what he was being told. To the contrary, at least one officer admitted that he did not expect Julian to understand.

Clearly, it is impossible to find, from these facts alone, that the respondent's statements were a voluntary result of a valid waiver of his *Miranda* rights. No further relevant facts were adduced at the hearing. The presentment agency, whose burden it was to establish voluntariness, offered no evidence or witnesses on the crucial issue of Julian's ability to understand and waive his rights. In fact, the agency blocked the testimony of the one witness who might have shed light on the subject,

---

2. We note that were we to find a valid waiver on this record, the confessions might still be rendered inadmissible because they followed so closely upon the improper custodial questioning of Julian before he was advised of rights *(see, People v Bethea,* 67 NY2d 364; *cf. Oregon v Elstad,* 470 US 298).

the court-appointed psychiatrist, Dr. Kaplan. Neither did the hearing court itself inquire into the validity of Julian's waiver, the issue that should have been the sole focus of this rambling *Huntley* hearing. As the record is barren of any evidence that Julian B. was able to and did understand his rights, the presentment agency utterly failed to prove that the statements in question were voluntary beyond a reasonable doubt.

We do not suggest in any way that a child of seven years or similar tender age, is incapable per se of understanding or waiving his rights. Rather, the age, intellectual capacity, time of day and manner of questioning are all factors to be taken into account in determining if a statement is voluntary under the totality of the circumstances. We do point out, however, that an evaluation of these various factors may occasionally require an extra effort to assure that the rights are explained in language comprehensible to the minor suspect. In *People v Williams* (62 NY2d 285, *supra),* it was determined that a valid waiver had been made by the "20-year-old, functionally illiterate, borderline mentally retarded" and "slow" adult defendant, because he had been advised of his rights in simple, detailed language, and his understanding of each right was verified by the officers before proceeding on to the next. The solicitude the courts have consistently demonstrated for the rights of minors should require no less attention than was given the defendant in *Williams.* It should be obvious that particular care must be taken in giving the warnings and obtaining waivers from particularly young children, especially those who are intellectually limited.[3]

---

**3.** A suggestion for simplified warnings, based upon *State v O'Connor* (346 NW2d 8 [Iowa 1984]) is found in Nissman, Hagen, Brooks, Law of Confessions § 6:13, at 174:

"Table 6-4" Juvenile Miranda Rights

"1. You have the right to remain silent. That means you don't have to say anything.

"2. Anything you say can and will be used against you in a Court of Law. That means what you say or write can be used to prove what you may have done. Do you understand that? Any questions?

"3. You have the right to talk to a lawyer and have the lawyer present with you while you are being questioned. That means that a lawyer can be with you at all times and the lawyer may tell you what the lawyer wants you to do or say. Do you understand that? Any questions?

"4. If you want an attorney, and you cannot afford to hire an attorney, one will be appointed to represent you before any questioning. That means the cost of having an attorney will be paid by someone else if you cannot pay for it. Do you understand this? Any questions?

Under the circumstances of this case, the determination to suppress the statements as involuntary must be sustained. Accordingly, the amended order dated July 16, 1984, should be affirmed.

---

"5. Without your parents agreement, you cannot give up your right to have a lawyer with you and advise you during questioning. Your parents must agree in writing. Do you understand this? Any questions?

"6. You can refuse to answer any or all questions at any time, or choose at any time to have a lawyer with you during further questioning. Do you understand that I have to stop talking to you any time you say you want to stop and wait for a lawyer? Any questions?

"Waiver of Rights

"I have read my rights as listed above. I understand each of them. I have been asked if I have any questions and I do not have any. I am, right now, willing to give a statement and answer questions and give up my right to have a lawyer present. No promises or threats have been made to me to make me give up my rights. I understand I may change my mind at any time and say I want my rights if I choose

"Signature of Child        Date and Time _____

"Signature of Child        Date and Time _____".

We are not offering these warnings as formal guidelines, but merely as an example.