OPINION OF THE COURT
Stephen J. Bogacz, J.
The United States Supreme Court introduced the now familiar Miranda warnings[1] (see Miranda v Arizona, 384 US 436 [1966]) to American jurisprudence over 45 years ago. In determining that the general principle that citizens are presumed to know the law did not extend to police detainees being subjected to custodial interrogation, the High Court directed that the police must first advise detainees of those rights “in clear and unequivocal terms.” (Id. at 467-468.) An ever-expanding body of state and federal case law has provided interpretive meaning to the Supreme Court’s mandate since 1966.
For example, it is now well-settled that no “talismanic incantation” of a precise formula is required when law enforcement personnel administer the warnings to a detainee, so long as the meaning of the warnings is fully communicated. (California v Prysock, 453 US 355, 359 [1981]; People v Parker, 258 AD2d 479 [2d Dept 1999]; People v Bartlett, 191 AD2d 574 [2d Dept 1993]; People v Crosby, 91 AD2d 20 [2d Dept 1983]; see also People v John, 288 AD2d 848 [4th Dept 2001]; People v Peraza, 288 AD2d 689 [3d Dept 2001].) On the other hand, omission of any part of the Miranda rights will subject a subsequent statement to suppression. (See People v Tutt, 38 NY2d 1011 [1976]; People v Hermanee, 35 NY2d 915 [1974]; see also People v Grace, 245 AD2d 387 [2d Dept 1997].)
*597 Proper administration of the Miranda warnings to underage police detainees has spawned its own specialized body of case law. Courts have long recognized the existence of a less-than-level playing field when police question youthful suspects. Even well before the Miranda decision, the United States Supreme Court acknowledged the need for courts to utilize “special care in scrutinizing the record” concerning police interrogation of an accused 15-year-old male and his ensuing confession. (Haley v Ohio, 332 US 596, 599 [1948].) The Court further observed that “[a]ge 15 is a tender and difficult age . . . . He cannot be judged by the more exacting standards of maturity. That which would leave a man cold and unimpressed can overawe and overwhelm a lad in his early teens.” (Id.)
Post-Miranda, New York State’s Appellate Division, Second Department, developed what is now established law in a series of decisions that defined and mandated a standard of “greater care” to protect the rights of young detainees who are questioned by the police. In People v Ward (95 AD2d 351, 353 [2d Dept 1983]), the Second Department liberally quoted the above language from Haley in holding that “[a] child of 15 years of age should not be judged by the more exacting standards of maturity” and suppressed the youth’s admission to the police. Three years later, the Second Department noted that “[i]t is well recognized that. . . the police must exercise greater care to insure that the rights of youthful suspects are vigilantly observed” (People v Hall, 125 AD2d 698, 701 [2d Dept 1986] [emphasis added]), in again relying upon Haley and suppressing another 15 year old’s confession to law enforcement.[2]
This standard of “greater care” was subsequently given a more precise definition. In Matter of Chad L. (131 AD2d 760 [2d Dept 1987]), the Court redefined the “reasonable person, innocent of any crime” standard that determines whether a person is in police custody when questioned. The Court essentially carved out a “reasonable 10 year old” subset from the greater group to whom the “reasonable person” yardstick applied (id. at 761). This “reasonable juvenile” test developed into settled law in a series of consistent decisions from three Appellate Division departments. (Matter of Robert H., 194 AD2d 790 [2d Dept 1993]; Matter of Rennette B., 281 AD2d 78 [1st Dept 2001]; Matter of Ricardo S., 297 AD2d 255 [1st Dept 2002]; *598 Matter of Angel S., 302 AD2d 303 [1st Dept 2003]; Matter of Dalton BB., 61 AD3d 1105 [3d Dept 2009].)
The additional requirements of “greater care” also necessarily impacted upon the Second Department’s review of how law enforcement personnel must administer the Miranda warnings[3] to children and adolescents. In the first of three cases, the Court acknowledged that age and intellectual capacity were among the factors to be considered in assessing whether a particular youth has voluntarily waived his/her rights under Miranda. It went on to suggest that “an evaluation of these various factors may occasionally require an extra effort to assure that the [Miranda] rights are explained in language comprehensible to the minor suspect.” (Matter of Julian B., 125 AD2d 666, 671 [2d Dept 1986] [emphasis added].) In Matter of Chad L., the Court extended this reasoning to a 10-year-old detainee. In the culmination of this trilogy, the Second Department was unable to “conclude that the People [had] met their burden of proving that [a] 13-year-old juvenile with no prior criminal involvement [had] . . . waived his Miranda rights” after the detective had “read him [those] rights . . . [w]ithout any further explanation.” (People v Gotte, 150 AD2d 488, 488 [2d Dept 1989] [emphasis added].)
This court must assess the facts of the case at bar against this backdrop of developed precedent in determining the voluntariness, as a matter of law, of the statement made to law enforcement by the 13 year old in question. Preliminarily, at the Huntley (see People v Huntley, 15 NY2d 72 [1965]) hearing that was had in this matter, the court had the unique opportunity to observe the demeanor and assess the credibility of the three witnesses who testified. The court essentially credits the testimony of the police detective, but does not fully credit the testimony of either the respondent’s mother or that of the respondent himself. The mother’s testimony was at times guarded and contradictory, and that of the respondent was often guarded and self-serving.
At the conclusion of any pretrial suppression hearing, the court is required to render specific findings of fact, and the conclusions of law to be drawn therefrom. The findings of fact are as follows:
*599 On or about November 13, 2012, the testifying detective met the 13-year-old respondent and his mother and stepfather at the offices of the Queens Child Abuse Squad. This followed two telephone conversations between the detective and the mother four days earlier, at which the detective advised the mother that her niece had made certain allegations against her son (the respondent) and that the detective needed to speak with the respondent concerning them. She essentially told the mother to “bring him in and he’ll be arrested” and further that he would have to see a judge. She also advised the mother that if she did not bring in her son, the detective would have to come to her home and arrest him. She did not affirmatively advise the mother that she could have an attorney present when she brought in her son.
When the respondent and his parents arrived that morning, the detective initially directed them to be seated in the waiting area while she went to retrieve her case folder. A short time later, the detective returned and brought the mother and stepfather to a different room, telling them that the mother’s niece had made an allegation of a sexual nature against the respondent, and that the detective had interviewed her and believed her. The mother then made some indication that she knew her son had done wrong, that during a party the mother had walked into a bedroom and found her son and her niece adjusting their clothing. The mother also offered that she was in the process of getting help for the respondent. The detective, motivated in part by her desire for the mother to cooperate, was solicitous of the mother, indicating she understood she was “going through a hard time.” The mother acknowledged in her testimony that, upon arriving at the police offices, she was aware of, and concerned about, the possibility of her son being sent to “juvenile jail.”
At this point, the detective advised the mother that she was going to read the “juvenile Miranda warnings” to her son and to arrest him. She indicated uncertainty as to whether he would then be able to return home. The detective then told the mother that it was “up to her” in terms of granting the detective permission to speak with the respondent. The mother, at this point, was crying, but indicated her “permission.” The stepfather then proceeded to the waiting area.
The respondent entered the room where the detective was already present with his mother. The detective called this room the “designated juvenile room” in conclusory fashion. She did *600 not testify by whom it was so “designated.” Previously, she had described the room as “tiny,” containing a small table and two chairs. The detective sat on one side, while the respondent and his mother sat across from her. The respondent was not handcuffed and did not ask for food or drink, or to use the bathroom. The detective then explained that she was going to read him a paper with his rights, using what she characterized as the “simplified juvenile Miranda sheet” which was received in evidence as presentment agency’s exhibit 1. At this point, the mother described herself as emotionally upset and that her mind “wasn’t really there.”
The detective then administered the first warning (replicating its delivery testimonially with a fairly flat affect) and the second warning (again simulating its communication, this time in a somewhat halting manner). The detective then testified to administering the remaining warnings in “the same fashion” as she had recreated the delivery of the first two. This conclusory testimony deprived the court of the opportunity to view the manner in which the remaining warnings were given, even in simulation. In any event, the detective then asked the respondent if he was willing to answer questions, and both he and his mother agreed. She did not offer the opportunity for the respondent and his mother to consult, either privately, or even with the detective present.
The mother, at this point, was crying and the detective informed the respondent that she was going to arrest him “because of the allegations.” The detective then asked the respondent if it was “OK” that his mother was present. The respondent indicated a preference to speak with the detective without his mother being present. The mother indicated her assent to that and left the room. There was no conversation between the mother and her son when she did so; she simply left the room. The detective then reiterated to the respondent that he was being arrested, and asked if he knew why he was there. The respondent replied it was “because of’ what happened between him and his cousin. The respondent then offered a lengthy, and inculpatory, verbal rendition of the events at the party.
At the conclusion of that statement, the detective told the respondent that, if he wanted to, he could write it down. The respondent did so, while alone in the room with the door closed and possibly locked. When the detective raised the possibility of the respondent writing out his statement, she did not ask him if *601 he first wished to speak with his mother. The detective estimated that approximately 25 minutes elapsed between the administration of the Miranda warnings and the conclusion of the respondent’s written statement. From the time the detective returned with her case folder, the mother never had an opportunity to speak privately with the respondent. From these facts, the court draws the following conclusions of law:
Preliminarily, there is no issue with respect to the nature of the police questioning in this case. It was clearly custodial interrogation, a determination not contested by the presentment agency. Family Court Act § 305.2 (4) (b) requires that any custodial interrogation only take place in a facility designated as suitable for such purpose by the chief administrator of the courts. While the police detective’s testimony was conclusory concerning her use of the “designated” juvenile room, it is well settled by appellate case law that the applicable standard in assessing the suitability of the room used for interrogation is that of substantial compliance. (Matter of Emilio M., 37 NY2d 173 [1975]; Matter of Rafael S., 16 AD3d 246 [1st Dept 2005]; Matter of Bree J., 183 AD2d 675 [1st Dept 1992]; Matter of Luis N., 112 AD2d 86 [1st Dept 1985]; see also Matter of Donta J., 35 AD3d 740 [2d Dept 2006].) In view of the testimony describing the room that was used in the instant matter (“tiny” but otherwise innocuous), the court finds that, at the very minimum, the police substantially complied with Family Court Act § 305.2 (4) (b). (See also Uniform Rules for Family Ct [22 NYCRR] § 205.20.)
A second issue involves the propriety of the police questioning the respondent alone, while his mother was voluntarily elsewhere in the police station. The court notes that the Family Court Act does not require the presence of a parent before the police may interrogate a youthful suspect in their custody. Indeed, the statute clearly contemplates the police conducting such interrogation in the absence of a parent/guardian, under certain circumstances. (See Family Ct Act § 305.2 [7], [8].) The issue before this court is whether this was permissible under the facts presented here, to wit: when the police asked the respondent, whose mother was both present and properly administered the Miranda warnings, if he preferred to speak with the detective alone.
This courts finds Matter of Jimmy D. (15 NY3d 417 [2010]) to be controlling authority. In that case, the facts considered by the Court of Appeals were virtually identical with those in the *602 case at bar. Both cases involved allegations of a sexual nature. In both cases, the respondent was brought to a female detective by his mother. Each respondent was 13 years of age, and agreed to speak alone with the detective. Each mother agreed that her son be questioned alone by the detective. While it might have been the better practice for the detective to have permitted private consultation between the respondent and his mother prior to that decision being made, the absence of such consultation cannot, in and of itself, serve as the basis for granting suppression, in light of the authority of Matter of Jimmy D.[4]
The analysis now turns to the key issue in this case: the sufficiency of the administration of the Miranda warnings. This suppression ruling hinges on the sufficiency of warning number 4 contained in presentment agency’s exhibit 1 in evidence (“Miranda Warnings [Simplified]”). On this form, the warning at issue reads:
“4. If you cannot afford an attorney, one will be provided for you without cost.
“Simplifiecl: That means if you want a lawyer but do not have the money to pay for one, the court will give you a lawyer for free.
“Do you understand?”
Preliminarily, since this appears to be a preprinted form, the court commends the New York City Police Department for its genuine attempt to follow through on the Miranda Court’s suggestion that “the States are free to develop their own safeguards for the privilege [against self-incrimination]” (384 US 436, 490), and for making the “extra effort to assure that the [Miranda] rights are explained in language comprehensible to [a] minor suspect.” (Matter of Julian B., 125 AD2d 666, 671 [1986].) This court questions neither the good intentions nor the effort of the NYPD. The court does, however, have a problem with the efficacy of that effort.
It is unfortunate that this court was deprived of the opportunity to assess even a facsimile administration of warning number 4 during the detective’s testimony. In and of itself, this failure to recreate this on the witness stand would not be fatal *603 to a finding of voluntariness as a matter of law. However, when it is coupled with “simplified language” that can generously be described as inaccurate, the problematic nature of the assessment is heightened. When the police advise a detainee that “the court will give you a lawyer for free,” this can only serve to confuse that detainee with respect to the timing of his/her right to an attorney. From the testimony adduced, this court has no way of knowing whether that phrase, “the court,” was emphasized or de-emphasized when the detective administered warning number 4. When the age of the detainee, 13, is added in, as well as the fact that the detective did not afford the mother and the respondent an opportunity to consult after the warnings, the court’s concerns are greatly magnified.
The Miranda Court, of course, placed great and repeated emphasis on the right to counsel at a police interrogation, calling the right to have counsel present at such questioning “indispensable to the protection of the Fifth Amendment privilege.” (384 US 436, 469.) The Court went on to explicate that “the need for counsel to protect the Fifth Amendment privilege comprehends not merely a right to consult with counsel prior to questioning, but also to have counsel present during any questioning if the defendant so desires.” {Id. at 470 [emphasis added].) It then stated that a police detainee “must be clearly informed that he [or she] has the right to consult with a lawyer and to have the lawyer with him [or her] during interrogation.” {Id. at 471 [emphasis added].) Specifically with reference to the right to assigned counsel, the High Court added:
“[t]his does not mean, as some have suggested, that each police station must have a ‘station house lawyer’ present at all times to advise prisoners. It does mean, however, that if police propose to interrogate a person they must make known to him [or her] that he [or she] is entitled to a lawyer and that if he [or she] cannot afford one, a lawyer will be provided for him [or her] prior to any interrogation.” {Id. at 474 [emphasis added].)
In summarizing the then new protocol for custodial interrogation, the Miranda Court reiterated that a detainee must be warned that “if he [or she] cannot afford an attorney one will be appointed for him [or her] prior to any questioning if he [or she] so desires.” (Id. at 479 [emphasis added].) These repeated and unequivocal admonitions clearly demonstrate the Court’s abiding concerns with respect to the nature of what is now “warning number 4.”
*604 As “simplified” in the case at bar, warning number 4 may be characterized as inaccurate at best, and misleading at worst. In any event, it is likely to confuse a 13 year old being confronted with an interrogation that is clearly immediate, and a right to assigned counsel that he could reasonably interpret as being sometime in the future, when before “the court,” and certainly beyond the immediate questioning session.
This court is aware of the later United States Supreme Court decision that approved use of more limited language with respect to this warning. (Duckworth v Eagan, 492 US 195 [1989].) In Duckworth, the police advised a detainee of the right to assigned counsel “if and when you go to court” {id. at 198 [emphasis omitted]), which accurately reflected Indiana law with respect to the timing of assignment of counsel to qualifying individuals. The holding in Duckworth, however, is not necessarily binding upon a New York State court, since it appears to be inconsistent with analogous New York precedent.
In People v Buckler (39 NY2d 895 [1976]), the New York State Court of Appeals considered a Mount Vernon, New York, Police Department preprinted warning number 4 that was virtually identical to that at issue in the instant matter, to wit: “We cannot ourselves furnish you a lawyer, but one will be appointed for you, if you wish, when you go to court.” {Id. at 896.) The Court asserted that “standing by itself,” this warning “would be considered to be deficient” {id., citing Miranda).[5] New York thus established a standard equal to that set forth in Miranda, with respect to the administration of Miranda warning number 4, but higher than that subsequently required by the United States Supreme Court in Duckworth. Such higher state mandates are consistent with established rules of constitutional interpretation. The United States Supreme Court, in practice, sets the minimal level for the nation regarding compliance with constitutional rules. Each state is free, in interpreting its own state constitution, to set forth a higher standard, as the Court of Appeals did in Buckler, at least once Duckworth interpreted Miranda, in the context of the permissible administration of warning number 4. While New York’s High Court has had the option to follow Duckworth since 1989, it has not done so. Buckler, as a result, remains controlling authority in New York State.
*605 Therefore, having considered all of the above factors and permutations and applying, as it must, the “greater care” standard mandated by well-settled law, the court concludes as follows:
- Taken alone, the questioning of this respondent by himself falls within the acceptable parameters set forth in Matter of Jimmy D., and does not render the respondent’s subsequent admission involuntary as a matter of law.
- Taken alone, the failure of the detective to facilitate consultation between the respondent and his mother, after administering the Miranda warnings and prior to her leaving the room, similarly does not require suppression.
- Taken alone, the failure of the presentment agency to testimonially replicate the manner of the detective’s administration of warning number 4 is also not fatal to the voluntariness of the ensuing statement.
However, when these factors are coupled with and considered together with the clearly defective nature of simplified Miranda warning number 4 in the instant matter, the analysis becomes particularly problematic. The Buckler Court found the almost identical warning to be “deficient” when given to an adult detainee (at 896). This court need not articulate the obviously different levels of maturity between an adult and a seventh grader. For a “reasonable 13 year old,” being advised that assigned counsel would be provided by the court is tantamount to telling that youth that a free attorney would not be available during the police questioning. The conclusion in Buckler is therefore controlling: simplified Miranda warning number 4, as administered in the instant matter, was deficient. While the Buckler Court ultimately found that the claimed inadequacies were “overcome by the other evidence produced at the hearing,” the decision is silent as to the specifics of that “other evidence” (id. at 897). To the contrary, in the case at bar, the “other evidence” before this court not only does not overcome that deficiency, it buttresses it. As a result, the defective and inaccurate nature of warning number 4, when coupled with the other evidence presented here (the detective questioning the respondent alone; the mother leaving the room without any consultation between her and her son; and the failure to attempt to testimonially simulate the way in which this warning was given to the respondent and his mother), takes the analysis beyond “particularly problematic” on the issue of the voluntariness of the respondent’s subsequent statement. Simplified warn *606 ing number 4 is deficient and, when considered together with the other factors enumerated above, that deficiency is fatal to voluntariness as a matter of law. Suppression of both the respondent’s oral and written statements is therefore granted.
It is therefore ordered, that the respondent’s motion is granted.

. Essentially unchanged since 1966, these include:
“the right to remain silent, that anything he [or she] says can be used against him [or her] in a court of law, that he [or she] has the right to the presence of an attorney, and that if he [or she] cannot afford an attorney one will be appointed for him [or her] prior to any questioning.” (384 US at 479.)

. See also Matter of Robert R (177 AD2d 857 [3d Dept 1991]), in which the Third Department adopted the Second Department’s analysis.

. Soon after the decision in Miranda, the Second Department held that, prior to the commencement of any custodial interrogation, a juvenile detainee, like an adult, must be given all of the Miranda warnings by law enforcement personnel. (Matter of Jose R., 35 AD2d 972 [2d Dept 1970]; see also Matter of David J., 56 AD2d 947 [3d Dept 1977].)

. The Second Department has recognized that the “emotional and intellectual immaturity of a [15-year-old youth] creates an obvious need for the advice of a guardian . . . at an interrogation.” (Matter of Michelet P., 70 AD2d 68, 71 [2d Dept 1979].) That decision, however, did not mandate that the police always afford an opportunity for the youth to consult with his/her parent or guardian prior to custodial interrogation.

. While the Court ultimately ruled that “any claimed inadequacies were overcome by the other evidence produced at the hearing” (id. at 896-897), this in no way undermines the Court’s conclusion that warning number 4, as administered in Buckler, was “deficient.” (Id. at 896.)