THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v
RICKY CROSBY, Appellant.

Second Department, January 3, 1983

APPEARANCES OF COUNSEL

*Matthew Muraskin* (*Michael J. Obus* of counsel), for appellant.

*Denis Dillon, District Attorney* (*Martin I. Saperstein* and *William C. Donnino* of counsel), for respondent.

### OPINION OF THE COURT

THOMPSON, J.

Responding within "a minute or less" to an 8:30 P.M. call reporting a holdup at 162 North Main Street in Freeport on the cold winter evening of January 21, 1979, Officer Anthony Giordano arrived at the scene within approximately five minutes of the event. He entered George's Luncheonette where he found Alice May, the elderly proprietress of the store, lying on the ground, a bullet hole in her forehead. Quickly obtaining information at the scene that described the perpetrators as two black males, one with a blue jacket, one with a dark jacket, one tall and thin, and one wearing purple or maroon pants, Giordano took off in immediate pursuit. After eliminating one direction as a potential area of investigation because nobody was observed running in that direction, Giordano went off in the other direction. After checking the cab station, Giordano went to the platform of the railroad station which was within one-quarter mile of the scene of the shooting and provided an obvious potential means of escape.

When Giordano first reached the platform he did not see anybody, but as he approached the east end of the station, an area not usually occupied at that time because trains were not long enough to reach it at that hour, he observed an individual drop a maroonish jacket to the ground. The east end of the platform housed an elevator shaft building, and when Giordano approached the individual, who was the only person at that location, the person managed to use the building to momentarily evade Giordano. When Giordano circled the building, he found the person, a tall, thin, male black with a purple design on his pants, already heading west on the platform. Giordano had drawn his gun during the stalking of the individual.

\*　　　\*　　　\*

Officer Joseph Stephens arrived at George's Luncheonette shortly after the transmission of the same radio report, and obtained a description of two perpetrators from two witnesses who were talking to Officer Stringer.* One of the perpetrators was alleged to be a tall, thin, black male wearing a maroon coat with a plaid lapel and possibly maroon pants. Acting independently of Giordano, Stephens also went to the railroad station, and on the way there received a description over the police radio that reiterated the maroon coat and pants description.

Arriving at the platform, Stephens observed a person at the east end of the platform wearing a maroon coat with a plaid lapel and maroon pants. He saw the person remove the coat and throw it into a puddle on the platform. As the person headed in a westerly direction on the platform, looking back and walking directly towards Stephens, Stephens observed Giordano emerge from behind the elevator shaft building, trailing the individual. Stephens drew his gun. At this point the individual was placed under arrest.

The individual, defendant Ricky Crosby, now wearing no more than a "shirt-like" jacket on his upper body, was arrested, frisked, and handcuffed within 13 minutes of Giordano's receipt of the initial call. After receiving his *Miranda* warnings, Crosby advised Giordano that "You're in a lot of trouble because I'm going to sue you. You've got the wrong guy." Explaining the discarded jacket, Crosby stated he had found it on the station and picked it up in order to look through the pockets. Although Crosby insisted he was alone and was returning to Brooklyn, he had no visible means of paying for such a trip. He did not have identification, and his statement that he had a ticket for the trip to Brooklyn was immediately proven false when all that was recovered from his pocket was an already used ticket and some change. Crosby was brought back to the scene of the crime at about 8:50 P.M.

When Crosby was returned to the scene of the crime for a showup, Helen Rydberg and James Boyden were present at the store. Both had been present at 8:25 P.M. when two men pushed their way in and executed an armed robbery. A

---

* It is noted that at this point Officer Stringer knew one of the witnesses by name. He subsequently took both of them home.

struggle occurred during the robbery, resulting in the beating of Boyden and the fatal shooting of Alice May. Immediately after the robbery, which lasted about five minutes, Rydberg had called the police "as soon as the two of them had their feet out of the door" and the police "were also at the door immediately". She remembered one of the perpetrators as about 20 years old, about five feet, six inches tall and wearing something of a maroon color. Rydberg testified at the suppression hearing that she unequivocally identified Crosby at the showup, although there was other testimony that the identification was tentative. Boyden was in a state of shock and failed to make any identification. When Crosby was returned to Officer Giordano so that he could be taken to the First Precinct in Baldwin he stated that he was cold and asked for the return of his previously discarded coat, of which he then admitted ownership. It was now 10:30 P.M.

On the night of the shooting Lisa Hendricks had been waiting at a bus stop across the street from George's Luncheonette on her way to a skating rink when she engaged in a 10 to 15 minute conversation with two black men, one of whom identified himself as Jamie from Brooklyn. One of the men was about five feet, six inches tall, 22 years old, and wore a tan jacket and sneakers. During the conversation one of the men told her, with reference to the luncheonette, that "they were going to hold the joint up", but she did not take this statement seriously. She boarded her bus at approximately 8:00 P.M. Later that evening she learned that Alice May had been shot, and she was brought to the precinct some time after 11:00 P.M. After viewing an office which contained Crosby and 8 or 9 other people, some of whom were black, she identified Crosby as one of the two men she had spoken with at the bus stop. She had previously been informed that one of the perpetrators had been caught, and she was told during the viewing to look at a specific side of the room. It was now approximately midnight.

At 1:00 A.M. Detective Thomas DePaolo and John Leahy began questioning Crosby after he agreed to talk with them following a further advisement of the *Miranda* warnings. Crosby stated that he had come to Freeport with a

friend to visit his girlfriend Gwen, but he did not know Gwen's last name or address, or the name of his cotraveler from Brooklyn. He left Gwen's home at 8:00 P.M. and went straight to the railroad station where he was arrested. Crosby insisted his one-way ticket from Brooklyn to Long Island was really a round trip ticket. He admitted ownership of the discarded jacket, which was maroon with plaid around the collar and tan toward the upper portion of the interior. He failed to explain why, on a cold winter evening, he would take the coat off and throw it down on the ground. A spot on one of Crosby's sneakers was tested for blood after the sneaker was voluntarily surrendered during this questioning period, and although a positive identification as blood could not be made, the reaction was consistent with that of blood. Crosby agreed to take a polygraph test, and the parties left for Mineola at approximately 3:00 A.M. for the administering of the test. After their arrival in Mineola, Crosby changed his mind and refused to take the polygraph test.

The detectives continued to question Crosby from 4:00 A.M. until 6:00 A.M. Crosby rejected offers of food. During this period it was learned that Crosby and one Willie Brister had been arrested previously on a burglary charge. Crosby also showed a sudden interest in the law of aiding and abetting, and "he just couldn't understand that [it] was possible" that one who went along on a robbery and failed to pull the trigger was equally responsible for the legal consequences of the shooting. At about 5:45 A.M. Crosby was informed that Ms. May had died from her wound, and his reaction was "I can't, I can't, I can't do it". At 6:00 A.M. Crosby was permitted to sleep.

At approximately 10:00 A.M., while Crosby slept, Assistant District Attorney Edward McCarty advised Detective DePaolo not to book Crosby, but to continue the investigation. Detective Byron Bartlett was assigned to take Crosby, who had no other apparent means of transportation, home. Bartlett was to wait for another person to be assigned to assist him in returning Crosby to Brooklyn. At approximately 11:05 A.M. Bartlett roused Crosby from his slumber and advised him that he would be taking him back to Brooklyn. After Crosby was offered coffee, a conversa-

tion ensued during which Bartlett explained to Crosby that he was a robbery expert and he understood how sometimes things would go sour during a robbery. In response to a question asked by Bartlett, Crosby denied that Willie Brister had been involved in this robbery. Bartlett pointed out that if he knew this he must know more. Crosby noted that "I was told I didn't have to talk to anyone and that I could have a lawyer". However, he responded to Bartlett because Bartlett spoke to him in a different manner than the other detectives and he also needed somebody to help him explain his problems to his aunt. Crosby spent about 30 minutes making an incriminating statement in which he characterized "the Big O" as the main actor in the robbery-murder. At this point Bartlett notified Detective DePaolo of the confession.

Crosby repeated his story to DePaolo, stating that it was the Big O who suggested the robbery and actually shot May. The story was repeated again to Detective Leahy, who reduced the statement to writing, and then had Crosby sign it after Leahy read it to him. Assistant District Attorney McCarty also conducted a question and answer period with Crosby commencing at about 3:30 P.M. on January 22, after again reiterating the *Miranda* warnings.

Crosby stated that he would help locate the Big O in Brooklyn, but he wanted Detective Bartlett to go with him to help explain his situation to his aunt. Crosby saw his aunt at about 7:00 P.M. and also showed those accompanying him the general area where they were likely to locate the Big O. The group returned from Brooklyn at about 9:45 P.M.

Pursuant to instructions from Assistant District Attorney McCarty a lineup was conducted shortly after midnight on January 23. Geraldine White and Randlyn English, who had seen Crosby lurking near the store prior to the robbery, and Chester Eason and Christopher Woodson, who had witnessed the actual crime, all picked Crosby out of the lineup.

The next morning Crosby sent a message that he wanted to speak to Bartlett. He asked Bartlett to rip up his statement. Crosby was arraigned at some point during that day.

The hearing court denied Crosby's motion to suppress evidence other than the responses to any questions asked of him prior to the giving of the *Miranda* warnings by Giordano on the railroad platform. Following a jury trial, Crosby was convicted of murder in the second degree, robbery in the first degree (two counts), robbery in the second degree, and criminal possession of a weapon in the second degree. We now affirm.

■ Crosby's primary position posited herein presumes a paucity of probable cause for his arrest on the railroad platform. He contends that the taint of this initial arrest without probable cause served to bar the admission of all of the evidence developed thereafter, including his damning incriminating statements and all evidence developed at the showups and lineup. We conclude, however, that there was probable cause to arrest Crosby on the railroad platform, and the evidence developed thereafter was in no way tainted.

There is no doubt that Crosby was subjected to a full scale arrest on the railroad platform when he was handcuffed at gunpoint so that he could be transported to the scene of the murder (see *People v Brnja,* 50 NY2d 366). Officers Giordano and Stephens had to act on probable cause. "Probable cause requires, not proof beyond a reasonable doubt or evidence sufficient to warrant a conviction (e.g., *People v Miner,* 42 NY2d 937, 938; *People v White,* 16 NY2d 270, 273), but merely information which would lead a reasonable person who possesses the same expertise as the officer to conclude, under the circumstances, that a crime is being or was committed (see e.g., *People v Oden,* 36 NY2d, at pp 384-385, *supra; People v Russell,* 34 NY2d 261, 262-264; see, also, *Henry v United States,* 361 US 98, 102)" (*People v McRay,* 51 NY2d 594, 602).

Officers Giordano and Stephens arrived at the scene of the crime almost immediately after its occurrence and took off, independently of each other, in hot pursuit of the perpetrators, with an opportunity to apprehend the culprits before they could effectuate their escape. They had been seen running in the direction of the railroad station. It was certainly logical to check the railroad station, a

potential avenue of escape, even if not the only potential available means of flight.

Upon arriving on the platform Giordano observed a single black male, wearing pants which had a purple design on it, occupying an otherwise desolate area of the platform where trains did not stop at that time of night, discard a maroon coat despite the cold of a winter evening in January. Stephens testified that he actually observed Crosby take the coat off and throw it into a puddle. The person acting in this highly suspicious and furtive manner did not otherwise have a winter coat on, but only a light jacket. When Giordano approached the individual, he was met with a course of evasion, and only Stephen's fortuitous and timely arrival on the scene cut short this scenario of potential flight. Although the police were looking for two men, it is not unusual to have perpetrators separate and flee independently of each other. Under the totality of the circumstances, we find that when the police arrived at a logical potential avenue of escape shortly after the commission of the crime and met a black male with purplish pants and a jacket with a plaid lapel lurking in a desolate part of the station, a person who then sought to evade identification by discarding his coat in the cold of winter (see *People v Alexander,* 37 NY2d 202), and otherwise sought to flee, they possessed probable cause to arrest the individual. As noted in *Sibron v New York* (392 US 40, 66), "deliberately furtive actions and flight at the approach of strangers or law officers are strong indicia of *mens rea*".

We further note that we do not place great significance in the decision of Assistant District Attorney McCarty to release Crosby the morning after his arrest. He may very well have concluded that even if probable cause to arrest Crosby had existed, the investigation had not yet developed facts which would establish his guilt beyond a reasonable doubt and that the better course would be to investigate the matter further. If anything, the decision demonstrates the fairness of the treatment afforded Crosby.

We also find that Officer Stephens had the right to rely on the information he received at the scene of the crime that one of the perpetrators had a plaid lapel on his coat. Stephens and Officer Stringer could not definitively supply

the name of the individual who imparted the knowledge of the plaid lapel, but this is not fatal to the use of this information. As stated in *People v Arthurs* (24 NY2d 688, 692-693):

"But it would be requiring the impossible that in all street encounters, however brief and evanescent, the police officer must obtain documentation or witnesses to verify his every act. Moreover, it is not tenable that a police officer's word should be so suspect, even in the sensitive area of search and seizure, that it may not be accepted unless corroborated like that of an accomplice criminal or complainant in a sex crime * * *

"It is not necessary, of course, in this case to determine whether information spontaneously provided in a street incident by a single civilian as bystander or alleged victim, who is later unavailable or unidentifiable, might provide probable cause for appropriate police action. Obviously there may be circumstances in which such action, such as stop, frisk, search, and even full arrest for a chargeable crime, would be reasonable, let alone mandated on a peace officer" (see *People v Cofield,* 55 AD2d 113, affd 43 NY2d 654).

In this situation, the police received information in a direct face to face encounter in which they had an opportunity to observe the facial expression and emotional state of the witness (see *People v De Bour,* 40 NY2d 210). They knew how the information was come by, and there was no reason to believe there was an expectation of private gain by the witness (see *People v Hicks,* 38 NY2d 90). The individual was even driven home by the police, and if the necessity had arisen it is likely he could have been traced and prosecuted had the facts and information imparted warranted such a course (*People v Flannagan,* 56 AD2d 289). Under the totality of the circumstances, we believe Officer Stephens, in effectuating the arrest, had the right to rely on the additional corroborative element of the plaid lapel.

In light of our determination that Crosby was properly arrested, we need not and do not pass on the provocative question of whether his confession to Detective Bartlett,

after receiving *Miranda* warnings on two earlier occasions, after five hours of sleep, and coming approximately 15 hours after what was clearly not a sham investigative arrest, would be admissible as free of any taint present in the initial arrest (see, generally, *Taylor v Alabama*, __ US __, 102 S Ct 2664; *Brown v Illinois*, 422 US 590; *People v Rogers*, 52 NY2d 527; *People v Martinez*, 37 NY2d 662).

■We have little difficulty in concluding that the admission to Detective Bartlett was made after a knowing, voluntary waiver of Crosby's *Miranda* rights. Crosby, a high school graduate who was no novice to the criminal justice system, had already received *Miranda* warnings twice after his arrest. The record fails to reflect his invocation of the right to remain silent or to have an attorney present during questioning. Crosby understood his rights well enough to repeat them to Bartlett on his own. He was sufficiently unintimidated by the situation to threaten to sue the police when he was arrested. He exercised his right to refuse to take a lie detector test. During his confessions, he interrupted the proceedings to call his friend. He was offered food throughout the evening, and made his confession after having slept for five hours. The police had every right to continue their investigation, even after the decision had been made to return Crosby to Brooklyn, and we can perceive of no reason to require the giving of the *Miranda* warnings for a third time before the questioning by Bartlett. The question of a waiver of the *Miranda* rights is not one of form, but of whether the defendant knowingly and voluntarily waived his rights (*North Carolina v Butler*, 441 US 369). Nor is there any requirement that the *Miranda* warnings be intoned every single time a suspect in custody is subjected to separate series of questioning within a short time interval. Under appropriate circumstances, a suspect who has waived his *Miranda* rights need not be warned again prior to subsequent questioning (see *People v Johnson*, 49 AD2d 663, affd 40 NY2d 882; *People v Caruso*, 45 AD2d 804; *People v Manley*, 40 AD2d 907; *People v Sanchez*, 88 Misc 2d 929; *United States v Phelps*, 443 F2d 246). The warnings are not to be treated as a magical incantation required to uphold the admissibility of any incriminating statement made in response to police

questioning, but are aimed at fully protecting a suspect's constitutional rights. Crosby, with a full knowledge of these rights, knowingly and voluntarily decided to forgo them. Accordingly, his incriminating statements to Bartlett and the ensuing statements to DePaolo, Leahy and McCarty were all admissible.

■ We do not believe that the confession must be suppressed as the result of a delay in arraignment. The Federal rule requiring the per se exclusion of a confession procured during a delay in arraignment (*Mallory v United States,* 354 US 449; *McNabb v United States,* 318 US 332) is not a limitation imposed on the States by the due process clause (*Gallegos v Nebraska,* 342 US 55) and it has been rejected in New York (see *People v Spano,* 4 NY2d 256, revd on other grounds 360 US 315). In this State, delay in arraignment is only one factor to be considered in assessing the voluntariness of a confession (*People v Holland,* 48 NY2d 861; *People v Dairsaw,* 46 NY2d 739; *People v Carbonaro,* 21 NY2d 271) and we do not believe that, by itself, it renders the confession inadmissible in this case (see *People v Tarsia,* 50 NY2d 1, 12-13).

We need not decide if the arraignment of Crosby was unreasonably delayed by the return to Brooklyn to look for "the Big O" and to allow him to speak with his aunt. We also need not decide if the identification of Crosby by Lisa Hendricks at a showup at the station house was unnecessarily suggestive. In light of the independent basis of identification possessed by Hendricks and the witnesses who identified Crosby at the lineup after he was returned from Brooklyn, and in light of his incriminating statements, there is no reasonable possibility that any erroneously admitted evidence contributed to the conviction (*People v Almestica,* 42 NY2d 222).

Defendant's other contentions having been considered and found to be without merit, the judgment of conviction should be affirmed.

TITONE, J. P., LAZER and WEINSTEIN, JJ., concur.

Judgment of the County Court, Nassau County, rendered November 26, 1979, affirmed.