OPINION OF THE COURT
Vincent M. Del Giudice, J.
*240 The indictment herein charges defendant with murder in the second degree and related charges.
A combined DunawayIMapp/Huntley¡Wade hearing (granted by a court of coordinate jurisdiction) was conducted before me on June 2 and June 7, 2005.
The People presented four witnesses, Police Detective Robert Hardy (now retired), Police Detective Peter McMahon, Police Lieutenant John Louis and Police Sergeant Robert Henderson, whose testimony I find to be credible and reliable.
The defendant presented no witnesses.
Following oral argument of the parties at the conclusion of the hearing testimony, the People moved to reopen the hearing for the purpose of calling defense counsel as a witness to further explore the issue raised and argued of whether an identified individual who telephoned the police precinct while defendant was being questioned as a suspect in this case was, as represented, a paralegal working with defense counsel and who had been directed by defense counsel to advise the police, inter alla, that defendant was in fact represented by defense counsel in this matter, thereby invoking defendant’s right to counsel. That oral motion was denied, but the People were granted leave to file a written motion to reopen the hearing and both parties were granted leave to submit legal memoranda regarding all issues presented at the hearing. In this connection,, the court granted the People’s request for a two-week adjournment to permit preparation and filing of the proposed motion.
The People’s written motion was filed with the court on July 1, 2005. In essence, the People now argue that “defendant had never asserted that statements be suppressed on the basis that he was represented by counsel until the People elicited such testimony at the time of the hearing.” Thus, the People argue that their oral motion to reopen the hearing made at the close of the hearing was “proper” and timely. Additionally, the People now argue that, during oral argument, the court improperly “placed the burden upon the People to prove the defendant was not represented by counsel.” In this connection, the People urge the court to consider that in defendant’s written motion “requesting suppression dated March 8, 2004, the defendant moved to suppress on lack of probable cause and Miranda violations.”
Initially, this court notes that defendant’s written omnibus motion, dated March 8, 2004, included a request for suppression of “any statements made by the defendant in violation of his *241 constitutional rights or otherwise obtained in violation of Miranda v Arizona, 384 US 436 (19[6]6), or in the alternative, for a hearing at which the issue of such statements may be litigated” (emphasis added). Although the People’s written response to that motion, dated March 17, 2004, apparently interpreted certain arguments in the motion papers as limiting the scope of the hearing on suppression of statements to issues of probable cause for defendant’s arrest and “voluntariness,” the People did not argue any limitations upon commencement of the hearing, which this court noted on the record was a combined Dunaway/Mapp/Huntley/Wade hearing, as ordered by a court of coordinate jurisdiction, with no specified limitation. Further, this court finds disingenuous the People’s current claim that during oral argument the court improperly shifted the burden of proof to the People “to prove the defendant was not represented by counsel,” and their related argument that the motion to reopen the hearing should be granted, in the court’s discretion, to permit the People “to establish that defendant was not in fact represented by counsel at the time he was being questioned.” It is well established that once evidence is elicited by a defendant to establish that the right to counsel had attached, and the People take a contrary position, the burden of proof necessarily shifts to the People to prove otherwise (see, e.g., People v Felder, 301 AD2d 458, 459 [1st Dept 2003], citing People v West, 81 NY2d 370, 379-381 [1993], and People v Marrero, 51 NY2d 56, 59 [1980]). Here, both sides had ample opportunity to elicit evidence regarding this specific issue at the hearing and both sides presented extended argument, citing relevant case law, regarding the issue.
Based upon all of the foregoing, the People’s written motion to reopen the suppression hearing to further explore the right to counsel issue in connection with defendant’s statements to the police must be denied. The People, having had a fair and full opportunity to present evidence at the hearing, are not entitled to a reopening of the hearing to further explore specific issues that were known to the People prior to the hearing, explored in depth on direct and cross-examination of the hearing witnesses, and argued extensively by both parties at the conclusion of the hearing testimony (see, People v Crandall, 69 NY2d 459 [1987]).
Findings of Fact
On October 25, 2003, Lieutenant John Louis, assigned to the 67th Precinct and on motor patrol, received a police broadcast *242 regarding a shooting that had occurred at approximately 3:00 a.m. within the 69th Precinct, in the vicinity of Avenue D and Remsen Avenue, in Kings County, including the license plate numbers of two vehicles observed leaving the scene of the shooting. Lieutenant Louis requested a computer check regarding the vehicles and attempted unsuccessfully to locate them at an address within the 69th Precinct that was provided through the computer check. Thereafter, knowing that a large party was being held at a club located in the vicinity of Albany Avenue and Rutland Road, in Kings County, Lieutenant Louis, with his partner, Police Officer Scott Velasquez, drove to that location. While stopped at a traffic light at Albany Avenue and Rutland Road between 5:00 and 5:30 a.m., Lieutenant Louis saw a two-door black Acura automobile bearing one of the broadcast license plate numbers being driven by a male later identified as defendant. With lights activated, Lieutenant Louis directed defendant to pull over and defendant, who had a female passenger in the car, complied.
Defendant was directed out of the car, Lieutenant Louis conducted a pat-down of defendant and a search of the car for weapons (none were recovered), and defendant was advised that his vehicle had been observed leaving the scene of the shooting incident herein. Lieutenant Louis asked defendant if he had been driving the car all night and defendant said he was just out to pick up his girlfriend. Lieutenant Louis then contacted the 69th Precinct to inquire if any witness was available for a showup and was advised to bring defendant to the 69th Precinct Detective Squad office. Although Lieutenant Louis testified that he didn’t think he would have let defendant leave, he asked defendant if he would come to the precinct house and defendant agreed.
Lieutenant Louis requested the assistance of Sergeant Robert Henderson to drive defendant to the 69th Precinct House. Officer Velasquez drove the Acura to the 69th Precinct House garage to turn it over to members of the detective squad. Defendant was not handcuffed for the trip to the precinct house. When they arrived there, Sergeant Henderson brought defendant to the detective squad interview room and left him there, still not handcuffed, with the door closed. The interview room was approximately 12 feet by 12 feet, containing a table, a bench and a couple of chairs, and was used alternatively as a lunchroom.
Pursuant to standard police policy to inventory all vehicles maintained in police custody, the police conducted an inventory *243 search of the black Acura, during which, inter alia, all personal property contained in the vehicle was vouchered, along with the vehicle itself, for safekeeping. Among the vouchered items was one box of .40 caliber bullets found in the car’s trunk.
Detective Robert Hardy (now retired) was assigned as the lead detective in this case on October 25, 2003. When he arrived for work at about 7:00 a.m., he learned from fellow detectives that the victim, Edwart Roydon (“Junior”) Ricketts, died from gunshot wounds received during an altercation that had occurred earlier that morning at Lome’s Bikini Bar on Avenue D, in Kings County. A suspect (defendant) was then in the interview room, with the door closed.
Detective Hardy looked into the interview room a few times and saw that defendant was sleeping on a cot inside the room.
At approximately 11:25 a.m., Detective Hardy entered the interview room and read the Miranda rights to defendant from a standard form entered into evidence as People’s exhibit No. 1. Defendant acknowledged his understanding of each right as read to him, both orally and by initialing and signing the form, and agreed to answer questions. Detective Hardy told defendant that he was investigating the shooting incident at the Bikini Bar on Avenue D and asked defendant what he was doing at that time. Defendant stated, in essence, that he had been out with some friends until about midnight and then had received a telephone call from his girlfriend asking him to pick her up from a club. Detective Hardy asked defendant if he would write out that statement and defendant agreed. In Detective Hardy’s presence, defendant handwrote a similar statement, entered into evidence as People’s exhibit No. 2, completing and signing it at approximately 11:35 a.m. on October 25, 2003. In this handwritten statement, defendant added that, after he received the telephone call from his girlfriend between 4:30 and 5:00 a.m., he drove to the club, and that his car was pulled over and he was told that there was a shooting and “this was the car.”
At approximately 1:20 p.m. on October 25, 2003, Detective Hardy again entered the interview room, accompanied by Detective Peter McMahon of the Brooklyn South Homicide Squad, and asked defendant again about his actions at the time in question. Defendant stated, in substance, that he had been at the club at that time; that he had witnessed an argument between his friend Spider and “some big guy”; and that he had heard gunshots as he left to pick up his girlfriend at another club.
Detective Peter McMahon testified that while he was in the interview room with defendant and Detective Hardy, Detective *244 Amalfitano opened the door at about 1:40 p.m. and motioned for him to step out. Detective McMahon complied and Detective Amalfitano told him that he had just spoken to an individual who identified himself as a paralegal at a law firm and who stated that his employer was going to be representing defendant. At that time, the caller did not give his name, but gave the attorney’s name, which the police recorded as “Barry Perna” (later known to be “Barry Turner”). Detective McMahon immediately conveyed Detective Amalfitano’s information to Detective Hardy, at which time the interview of defendant ceased.
At approximately 5:00 p.m., the same individual telephoned the precinct house again and spoke with Detective Sommers, while Detective McMahon stood nearby. Again the caller did not give his name, but asked for “the status of the case.”
At approximately 5:50 p.m., Detective McMahon telephoned the District Attorney’s office, advised Assistant District Attorney Stephen Murphy of the two telephone calls received thus far, and requested guidance regarding whether or not the interview of defendant could be resumed. The Assistant District Attorney directed Detective McMahon to try to find out the identity of the caller and tell him to have a lawyer call the detective squad office.
At approximately 6:00 p.m., the same individual again telephoned the precinct house, and again spoke with Detective Sommers, as Detective McMahon stood nearby. This time, the caller identified himself as David Korgan, an assistant to attorney Barry Turner, and gave Detective Sommers the attorney’s New York City address and telephone number. Mr. Korgan also advised that Mr. Turner was on vacation in Cancún; that he had spoken by telephone with Mr. Turner; and that Mr. Turner had instructed him to call the precinct house and tell the police that defendant was represented by him. After consulting with Detective McMahon, Detective Sommers told Mr. Korgan to have Mr. Turner, or a lawyer, call the precinct house. Mr. Korgan telephoned the precinct house shortly thereafter to advise that he was unable to reach Mr. Turner again in Cancún.
Defendant was not questioned further by the police until approximately 8:00 p.m., when Detectives Hardy and Sommers again entered the interview room. At that time, defendant was told that there were witnesses to the incident and asked defendant if he wanted to tell the police anything that would help him. Defendant then admitted that he had shot the victim and *245 gave details of the events leading up to the shooting. That oral statement was memorialized in a DD-5 form completed by Detective Hardy and entered into evidence as People’s exhibit No. 5. When defendant was asked if he would write out that oral statement, defendant requested that one of the detectives write it for him. Defendant then repeated his statement and Detective Sommers wrote it out. The written statement, signed by defendant at approximately 8:30 p.m. on October 25, 2003, was entered into evidence as People’s exhibit No. 3 and read into the record.
Meanwhile, a lineup was being prepared by Detective Karolowski and Police Officer Defonte, for viewing by three eyewitnesses (designated as confidential witness No. 1, confidential witness No. 2 and confidential witness No. 3). None of the witnesses had the opportunity to see defendant or any of the five fillers prior to viewing the lineup, nor did any have the opportunity to speak with the other witnesses after viewing the lineup. All subjects were seated and held number cards.
For the first lineup procedure (photos of which were entered into evidence as People’s exhibit No. 4 a, b), defendant chose the number 1 position. At approximately 8:50 p.m., confidential witness No. 1 was brought to the viewing room by Detective Hardy, who explained that the witness would view the six-subject lineup through a one-way window. Detective Hardy asked confidential witness No. 1 to tell him if he recognized anyone, and if so, how. Confidential witness No. 1 identified No. 1 (defendant) as the person who had shot the victim, and then left the precinct house.
Defendant was then asked if he wanted to change positions for the second lineup procedure (photos of which were entered into evidence as People’s exhibit No. 5 a, b), and defendant chose the number 2 position. At approximately 8:54 p.m., confidential witness No. 2 was brought to the viewing room by Detective Hardy, who explained that the witness would view the six-subject lineup through a one-way window. Detective Hardy asked confidential witness No. 2 to tell him if he recognized anyone, and if so, from where. Confidential witness No. 2 identified No. 2 (defendant) as the person who had shot the victim, and then left the precinct house.
Defendant was again asked if he wanted to change positions for the third lineup procedure (photos of which were entered into evidence as People’s exhibit No. 6 a, b), and defendant this time chose the number 6 position. At approximately 9:00 p.m., *246 confidential witness No. 3 was brought to the viewing room by Detective Hardy, who explained that the witness would view the six-subject lineup through a one-way window. Detective Hardy asked confidential witness No. 3 to tell him if he recognized anyone, and if so, from where. Confidential witness No. 3 identified No. 6 (defendant) as the person who had shot the victim, and then left the precinct house.
Following the lineup procedures, defendant was returned to the interview room. At all times when defendant was at the precinct house, he was given the opportunity to eat, drink and use a restroom, as desired. Defendant also used a cot in the interview room “quite often” to sleep on.
At approximately 11:48 p.m., full Miranda rights were again administered to defendant by Assistant District Attorney Murphy, who explained that he would like to ask defendant questions about the shooting incident that occurred on October 25, 2003. Defendant again acknowledged his understanding of all rights and stated that he wanted to speak with Assistant District Attorney Murphy and answer questions. After defendant was advised that he could choose to answer any, all or no questions, he gave a videotaped statement to Assistant District Attorney Murphy which was entered into evidence as People’s exhibit No. 7 and played in its entirety at the hearing. In the presence of Assistant District Attorney Murphy and Detective Hardy, defendant again admitted shooting the victim and gave details of the circumstances leading up to and following the shooting. Defendant also acknowledged being advised of the Miranda rights and initialing and signing the Miranda form earlier that day. Defendant also asked that his first written statement be thrown away because it was a lie and said that he was frightened of the victim and believed he would be shot by the victim; that he was “a little bit tipsy” at the time of the shooting; and that if he had not been drinking he would not have pulled the trigger.
Conclusions of Law
Contrary to defendant’s arguments, the police properly stopped and approached defendant upon observing him, between 5:00 and 5:30 a.m., driving a vehicle that reportedly left the nearby scene of a shooting incident that had occurred at approximately 3:00 a.m. (see, People v Williams, 121 AD2d 488 [1986], lv denied 68 NY2d 818 [1986]). In the circumstances presented, the police properly conducted a safety search for weapons (see, People v De Bour, 40 NY2d 210, 223 [1976]).
*247 Also contrary to defendant’s arguments, the police lawfully requested that defendant accompany them to the precinct house in connection with the ongoing investigation of the shooting incident (see, People v Morales, 42 NY2d 129, 135 [1977], cert denied 434 US 1018 [1978]). That defendant was not handcuffed, and that no force was employed by the police prior to or during the drive to the precinct house, or upon arrival at the precinct house, supports the police testimony that defendant was not arrested or subjected to overbearing police pressure at that time, but rather voluntarily accompanied the police to the precinct house (supra at 137-138).
Although police questioning of defendant did not begin until the Miranda rights were administered at approximately 11:25 a.m., it is clear that the lead detective assigned to investigate the shooting incident observed defendant asleep on a cot in the interview room when the detective arrived at the precinct house at about 7:00 a.m. and when he looked in on defendant on several occasions thereafter. Thus, there is no support for defendant’s argument that defendant was held at the precinct house an unreasonable length of time in connection with the investigation of the shooting incident herein (see, People v Morales, supra at 137, citing People v De Bour, supra).
Defendant’s first oral and written statements, made to Detective Hardy at approximately 11:25 a.m. on October 25, 2003, were preceded by proper administration of the Miranda rights. Defendant acknowledged his understanding of each of those rights and made a knowing, intelligent and voluntary waiver thereof. Thus, defendant’s motion for suppression of those statements is denied.
Although the Miranda rights were not readministered to defendant prior to his second oral statement to Detective Hardy at approximately 1:20 p.m. on October 25, 2003, since defendant had been advised of the Miranda rights less than two hours earlier and had made a knowing, intelligent and voluntary waiver thereof at that time, there was no need for the police to readvise defendant of those rights (see, People v Crosby, 91 AD2d 20, 29 [1983], lv denied 59 NY2d 765 [1983]). Thus, defendant’s motion for suppression of that statement is denied.
Defendant’s admission for the first time, in his oral statement made at approximately 1:20 p.m. on October 25, 2003, that he had in fact been present at the time and place of the shooting, coupled with police observation of defendant between 5:00 and 5:30 a.m. driving a vehicle reported to have fled the scene of the *248 shooting about two hours earlier, and defendant’s prior conflicting statements regarding his activities at the time in question, provided probable cause to believe that defendant had committed a crime, and supported continued investigatory detention of defendant for purposes of further questioning and a lineup procedure (see, People v Cantor, 36 NY2d 106, 111-112 [1975]). Nevertheless, police questioning of defendant ceased when Detective Hardy was advised, at approximately 1:40 p.m., that an individual identifying himself only as a paralegal at a law firm, had telephoned the precinct house to advise that his employer, whose name the police recorded as “Barry Perna” (later known to be “Barry Turner”), would be representing defendant.
The People argue that defendant’s right to counsel did not attach upon subsequent telephone calls to the precinct house by the same caller, at approximately 5:00 p.m. and 6:00 p.m., respectively, during which the caller identified himself as David Korgan, an assistant to attorney Barry Turner, provided a New York City business address and telephone number for Mr. Turner, and advised that following telephone contact with Mr. Turner (who was then in Cancún), he was directed by Mr. Turner to telephone the precinct house on his behalf to advise that defendant was represented by counsel. In this connection, the Third Department has held, and the Court of Appeals has affirmed, that a law clerk who telephoned the police on behalf of his attorney-employer to advise that the attorney would be representing an individual then in police custody effectively served to invoke the right to counsel, thereby requiring that custodial questioning cease (People v Ressler, 24 AD2d 7 [1965], amended by 24 AD2d 727 [1965], affd 17 NY2d 174 [1966], rearg denied 17 NY2d 918 [1966]). Thus, the issue presented herein is whether, as argued by defendant, a paralegal who makes such a telephone call at the direction of his attorney-employer similarly serves to invoke the right to counsel, thereby requiring that custodial questioning cease. For the following reasons, this court holds in the affirmative. .
Initially, the People’s arguments concerning defendant’s burden to prove that he was represented by counsel “on an unrelated charge” neglects the fact that in this case the caller advised the police that his attorney-employer was representing defendant in the instant matter and specifically requested, on behalf of the attorney-employer, the status of the instant case. Thus, the right to counsel issue is squarely presented in this case (see, e.g., People v Rosa, 65 NY2d 380, 384 [1985]).
*249 The status of a paralegal in the employ of an attorney has been addressed by the Second Department in Glover Bottled Gas Corp. v Circle M. Beverage Barn (129 AD2d 678 [1987]). As the Glover court recognized, although the Code of Professional Responsibility, adopted by that Court to govern the conduct of attorneys within the Second Department, does not apply to non-lawyers, it places a burden on attorneys to insure that their nonlawyer employees, including paralegals, comply with all provisions of the Code applicable to attorneys (at 679). Thus, pursuant to the Code’s canons, ethical considerations and mandatory disciplinary rules, nonlawyer employees of an attorney, including agents, law clerks, paralegals and legal secretaries, are charged, inter alla, with the preservation of matters within the attorney-client privilege that are revealed to them through such employment (see, Code of Professional Responsibility, Preliminary Statement; see, also, Code of Professional Responsibility DR 4-101 [d] [22 NYCRR 1200.19 (d)]; Connors, Practice Commentaries, McKinney’s Cons Laws of NY, Book 29, Judiciary, Code of Professional Responsibility DR 4-101, at 83-84).
In this case, the evidence elicited was that an individual representing himself as a paralegal assisting his attorney-employer regarding a matter within the attorney-client privilege, telephoned the police, allegedly pursuant to the attorney-employer’s direction, to advise of the attorney’s representation of defendant. It is well established that the burden to prove attachment of the right to counsel is borne by the defendant (see, e.g., People v Cameron, 6 AD3d 273, 274 [2004], lv denied 3 NY3d 672 [2004]). As argued by the People, defendant has failed to meet his burden of proof to establish that the individual who represented himself to the police as a paralegal or assistant of defense counsel was, in fact, a professional associate of defense counsel at the time in question which, in the circumstances presented herein, is a necessary element of proof to establish the attachment of the right to counsel (see, People v Grice, 100 NY2d 318, 324 [2003]). Having thus failed in his burden of proof, defendant’s motion for suppression, on the ground of an alleged violation of the right to counsel, of additional oral and written statements made in response to custodial questioning at approximately 8:00 p.m. on October 25, 2003, is denied. In this connection, there was no need for readministration of the Miranda warnings prior to these statements, since defendant remained in continuous police custody from the time of the proper administration of the Miranda warnings at approxi *250 mately 11:25 a.m., about eight hours earlier, and defendant had made a knowing, intelligent and voluntary waiver of the rights recited at that time (see, People v Baker, 208 AD2d 758 [1994], lv denied 85 NY2d 905 [1995]).
Parenthetically, the People’s argument that because defense counsel was not physically in New York City at the time in question, the right to counsel could not have been invoked effectively by telephone advice to the police, neglects the consistent holdings of the Court of Appeals rejecting mechanical requirements that would undermine the right to counsel and declaring specifically that counsel is not required to be physically present at the location where his client is in custody, so long as the attorney or a professional associate of the attorney notifies the police that the suspect is represented by counsel in the matter at issue (see, People v Grice, supra at 323-324).
Defendant’s videotaped statement, made at approximately 11:48 p.m. on October 25, 2003, was preceded by full readministration of the Miranda warnings. Again defendant acknowledged his understanding of each right recited and made a knowing, intelligent and voluntary waiver thereof. Thus, defendant’s motion for suppression of his videotaped statement is denied.
Contrary to defendant’s argument, the police properly conducted a routine inventory search of the automobile maintained in police custody, to safeguard and voucher the vehicle and its contents pursuant to standard police policy and procedure (see, People v Johnson, 1 NY3d 252, 256 [2003]). Thus, defendant’s motion for suppression of the box of bullets found in the trunk of the vehicle pursuant to such routine inventory search is denied.
Also contrary to defendant’s argument, a review of the lineup photographs confirms that all fillers were sufficiently similar in appearance to defendant to assure that the lineup procedures were not unduly suggestive. In this connection, all fillers appear similar to defendant in facial features, skin tone and hairstyle, and any differences in height or weight were minimized by having all subjects seated and holding large number cards. Thus, contrary to defendant’s argument, the lineup procedures were in no way unduly suggestive (see, People v Chipp, 75 NY2d 327 [1990], cert denied 498 US 833 [1990]) and defendant’s motion for suppression of the identification testimony is denied.